# 25-3221

## United States Court of Appeals for the Second Circuit

NATIVE AMERICAN GUARDIAN'S ASSOCIATION, DAVID FINKENBINDER, WANBLEE OHITIKA (BRAVE EAGLE),

*Plaintiffs-Appellants*,

v.

NEW YORK STATE BOARD OF REGENTS,

*Defendants-Appellees*.

(*caption continues inside front cover*)

On Appeal from the United States District Court for the Eastern District of New York

**BRIEF FOR APPELLEES**

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
STEPHEN J. YANNI
*Assistant Solicitor General*
*of Counsel*

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees
28 Liberty Street
New York, New York 10005
(212) 416-6184

Dated: April 8, 2026

(*caption continued from front cover*)

LESTER W. YOUNG, JR., in his official capacity as Chancellor of the New York State Board of Regents, ROGER TILLES, in his official capacity as a member of the New York State Board of Regents, CHRISTINE D. CEA, in her official capacity as a member of the New York State Board of Regents, WADE S. NORWOOD, in his official capacity as a member of the New York State Board of Regents, KATHLEEN M. CASHIN, in her official capacity as a member of the New York State Board of Regents, JAMES E. COTRELL, in his official capacity as a member of the New York State Board of Regents, JUDITH CHIN, in her official capacity as a member of the New York State Board of Regents, CATHERINE COLLINS, in her official capacity as a member of the New York State Board of Regents, ELIZABETH S. HAKANSON, in her official capacity as a member of the New York State Board of Regents, LUIS O. REYES, in his official capacity as a member of the New York State Board of Regents, SUSAN W. MITTLER, in her official capacity as a member of the New York State Board of Regents, FRANCES G. WILLS, in her official capacity as a member of the New York State Board of Regents, ARAMINA VEGA FERRER, in her official capacity as a member of the New York State Board of Regents, SHINO TANIKAWA, in her official capacity as a member of the New York State Board of Regents, ROGER P. CATANIA, in his official capacity as a member of the New York State Board of Regents, ADRIAN I. HALE, in his official capacity as a member of the New York State Board of Regents, JOSEPHINE VICTORIA FINN, in her official capacity as Vice Chancellor of the New York State Board of Regents,

*Defendants-Appellees.*

# TABLE OF CONTENTS

**Page**


TABLE OF AUTHORITIES ..... iii

PRELIMINARY STATEMENT ..... 1

ISSUES PRESENTED ..... 4

STATEMENT OF THE CASE ..... 4

A. New York State Education Department's Regulations Prohibiting the Use of Indigenous Names, Logos, and Symbols as Mascots ..... 4

B. Massapequa Union Free School District's Lawsuit Challenging Part 123 ..... 10

C. Massapequa's Agreement with Native American Guardian's Association (NAGA) ..... 12

D. The Proceedings Below ..... 14

STANDARD OF REVIEW ..... 18

SUMMARY OF ARGUMENT ..... 18

ARGUMENT ..... 24

POINT I

THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIMS FOR LACK OF STANDING ..... 24

A. NAGA Lacks Standing ..... 25

1. NAGA fails to establish standing based on its illusory Agreement with Massapequa ..... 26

2. NAGA fails to allege any other injury under the Equal Protection Clause or the First Amendment. ..... 31

**Page**


3. NAGA fails to allege the diversion of organizational resources. .... 35

4. NAGA lacks associational standing to sue on behalf of its members. .... 37

B. Finkenbinder Lacks Standing. .... 40

C. The District Court Correctly Ruled that Plaintiffs Lack Standing to Bring Certain Claims, and Plaintiffs Waived Any Challenge to Those Rulings. .... 42

POINT II

THIS COURT MAY AFFIRM ON THE INDEPENDENT, ALTERNATIVE GROUND THAT THE COMPLAINT FAILS TO STATE A CLAIM .... 45

A. Plaintiffs Fail to State an Equal Protection Claim or a Title VI Claim. .... 45

B. Plaintiffs Fail to State a 42 U.S.C. § 1981 Claim. .... 49

C. Plaintiffs Fail to State a First Amendment Claim. .... 52

D. Plaintiffs Fail to State a Due Process Claim. .... 55

E. Plaintiffs Fail to State a Dormant Commerce Clause Claim. .... 58

F. Plaintiffs Fail to State an Indian Commerce Clause Claim. .... 59

POINT III

THE DISTRICT COURT CORRECTLY DENIED A PRELIMINARY INJUNCTION .... 61

CONCLUSION .... 65

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*A.H. ex rel. E.H. v. New York State Dep't of Health*,
147 F.4th 270 (2d Cir. 2025) ........ 38

*A.H. ex rel. Hester v. French*,
985 F.3d 165 (2d Cir. 2021) ........ 62

*Abbott v. Perez*,
585 U.S. 579 (2018) ........ 63

*Advance Pharm., Inc. v. United States*,
391 F.3d 377 (2d Cir. 2004) ........ 57

*Aguayo v. Richardson*,
473 F.2d 1090 (2d Cir. 1973) ........ 55

*Alexander v. Sandoval*,
532 U.S. 275 (2001) ........ 48

*Beijing Neu Cloud Oriental Sys. Tech. Co. v. International Bus. Machs. Corp.*,
110 F.4th 106 (2d Cir. 2024) ........ 45

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ........ 49

*Bell v. Hood*,
327 U.S. 678 (194 ........ 25

*Board of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State Tchrs. Ret. Sys.*,
60 F.3d 106 (2d Cir. 1995) ........ 41

*Bob Jones Univ. v. United States*,
461 U.S. 574 (1983) ........ 46

*Brokamp v. James*,
66 F.4th 374 (2d Cir. 2023) ........ 52, 57

**Cases** **Page(s)**

*Brown v. City of Oneonta*,
221 F.3d 329 (2d Cir. 2000) .......................................................... 49, 51

*Center for Reprod. L. & Pol'y v. Bush*,
304 F.3d 183 (2d Cir. 2002) .................................................................. 43

*Chiapparelli v. Baker, Kellogg & Co.*,
252 N.Y. 192 (1929) ............................................................................... 29

*Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge*,
98 F.4th 386 (2d Cir. 2024)........................................................... 37, 41

*City of New York v. Richardson*,
473 F.2d 923 (2d Cir. 1973) .................................................................. 55

*Connecticut Citizens Def. League, Inc. v. Lamont*,
6 F.4th 439 (2d Cir. 2021).............................................................. 35-36

*Connecticut Citizens Def. League, Inc. v. Thody*,
No. 23-724, 2024 WL 177707 (2d Cir. Jan. 17, 2024) ........................ 38

*Davis v. FEC*,
554 U.S. 724 (2008)................................................................................ 25

*Do No Harm v. Pfizer Inc.*,
126 F.4th 109 (2d Cir. 2025)......................................................... 37, 39

*Doe v. Hochul*,
139 F.4th 165 (2d Cir. 2025)................................................................. 31

*Domino's Pizza, Inc. v. McDonald*,
546 U.S. 470 (2006)................................................................................ 50

*Downs v. Los Angeles Unified Sch. Dist.*,
228 F.3d 1003 (9th Cir. 2000)............................................................... 53

*Fair Emp. Counsel of Greater Wash., Inc. v. BMC Mktg. Corp.*,
28 F.3d 1268 (D.C. Cir. 1994) ............................................................... 26

**Cases** **Page(s)**

*Farrell v. Burke*,
449 F.3d 470 (2d Cir. 2006) ....................................................52-53

*FDA v. Alliance for Hippocratic Med.*,
602 U.S. 367 (2024)........................................................... 24, 26

*Fund Liquidation Holdings LLC v. Bank of Am. Corp.*,
991 F.3d 370 (2d Cir. 2021) ....................................................... 18

*Garcetti v. Ceballos*,
547 U.S. 410 (2006)................................................................... 54

*General Motors Corp. v. Tracy*,
519 U.S. 278 (1997)................................................................... 59

*Grand River Enters. Six Nations, Ltd. v. Pryor*,
425 F.3d 158 (2d Cir. 2005) ....................................................... 60

*Gross v. Rell*,
585 F.3d 72 (2d Cir. 2009) .................................................... 37, 42

*Hamer v. Sidway*,
124 N.Y. 538 (1891) .................................................................. 30

*Heckler v. Mathews*,
465 U.S. 728 (1984)................................................................... 32

*Hein v. Freedom From Religion Found., Inc.*,
551 U.S. 587 (2007)................................................................... 41

*Hollingsworth v. Perry*,
570 U.S. 693 (2013)................................................................... 39

*Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*,
28 N.Y.3d 675 (2017) ................................................................ 26

*Lujan v. Defenders of Wildlife*,
504 U.S. 555 (1992)............................................................ 24, 34, 38

**Cases** **Page(s)**

*Manufacturers Tr. Co. v. Kennedy*,
291 F.2d 460 (2d Cir. 1961) .......... 27

*Massapequa Union Free Sch. Dist. v. New York State Bd. of Regents*,
No. 2:23-cv-07052, 2025 WL 929710 (E.D.N.Y. Mar. 27, 2025) .......... 11

*Matter of Cambridge Cent. Sch. Dist. v. New York State Educ. Dep't*,
Index No. 902161-22 (Sup. Ct. Albany County June 22, 2022) .......... 7

*MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*,
861 F.3d 40 (2d Cir. 2017) .......... 32, 35, 41, 43

*Morton v. Mancari*,
417 U.S. 535 (1974) .......... 51

*Murray v. Northrop Grumman Info. Tech., Inc.*,
444 F.3d 169 (2d Cir. 2006) .......... 27

*Murthy v. Missouri*,
603 U.S. 43 (2024) .......... 31-32, 40

*National Ass'n for Gun Rights v. Lamont*,
153 F.4th 213 (2d Cir. 2025) .......... 61-63

*National Pork Producers Council v. Ross*,
598 U.S. 356 (2023) .......... 58

*North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*,
883 F.3d 32 (2d Cir. 2018) .......... 62

*Otoe-Missouria Tribe of Indians v. New York State Dep't of Fin. Servs.*,
769 F.3d 105 (2d Cir. 2014) .......... 59-61

*Patterson v. County of Oneida*,
375 F.3d 206 (2d Cir. 2004) .......... 49

**Cases** **Page(s)**

*Pyke v. Cuomo*,
567 F.3d 74 (2d Cir. 2009) .................................................... 46

*Reed v. Town of Gilbert*,
576 U.S. 155 (2015) .................................................... 52

*Rock of Ages Corp. v. Secretary of Labor*,
170 F.3d 148 (2d Cir. 1999) .................................................... 56

*Rodrigues v. City of New York*,
835 F. App'x 615 (2d Cir. 2020) .................................................... 48

*Rojas v. Cigna Health & Life Ins. Co.*,
793 F.3d 253 (2d Cir. 2015) .................................................... 61

*Selevan v. New York Thruway Auth.*,
584 F.3d 82 (2d Cir. 2009) .................................................... 43, 58-59

*Slattery v. Hochul*,
61 F.4th 278 (2d Cir. 2023) .................................................... 55

*Spirit Lake Tribe of Indians ex rel. Comm. of Understanding & Respect v. NCAA*,
715 F.3d 1089 (8th Cir. 2013) .................................................... 51

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) .................................................... 35

*Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*,
600 U.S. 181 (2023) .................................................... 36, 47

*United States v. Hays*,
515 U.S. 737 (1995) .................................................... 32

*United States v. Thompson*,
896 F.3d 155 (2d Cir. 2018) .................................................... 53

**Cases** **Page(s)**

*Upstate Citizens for Equal., Inc. v. United States*,
841 F.3d 556 (2d Cir. 2016) ........................................................ 44

*Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*,
454 U.S. 464 (1982) ........................................................ 34

*Vermont Right to Life Comm., Inc. v. Sorrell*,
758 F.3d 118 (2d Cir. 2018) ........................................................ 56

*Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*,
455 U.S. 489 (1982) ........................................................ 53, 56-57

*Washington State Grange v. Washington State Republican Party*,
552 U.S. 442 (2008) ........................................................ 54

*Ysursa v. Pocatello Educ. Ass'n*,
555 U.S. 353 (2009) ........................................................ 34, 55

**Constitutions**

N.Y. Const. art. XI, § 1 ........................................................ 4

U.S. Const. art. I, § 8, cl. 3 ........................................................ 59

**Statutes**

Cal. Educ. Code § 221.3 ........................................................ 10

Colo. Rev. Stat. Ann. § 22-1-133 ........................................................ 10

Conn. Gen. Stat. Ann. § 3-55j ........................................................ 10

Me. Rev. Stat. Ann. tit. 20-A, § 12 ........................................................ 10

Minn. Stat. § 121A.041 ........................................................ 10

**Statutes** **Page(s)**

N.Y. Educ. Law
§ 11 ........................................ 6, 47
§ 12 ........................................ 6
§ 101 ........................................ 4
§ 207 ........................................ 4
§ 305 ........................................ 4-5
§ 309 ........................................ 5

Nev. Rev. Stat. Ann. § 388.045 ........................................ 10

Vt. Stat. Ann. tit. 16, § 568 ........................................ 10

Wash. Rev. Code Ann. § 28A.320.296 ........................................ 10

**Regulations**

8 N.Y.C.R.R.
§ 123.1 ........................................ 8, 46
§ 123.1 et seq. ........................................ 1
§§ 123.1-123.2 ........................................ 32, 48
§§ 123.1-123.5 ........................................ 7, 57
§ 123.2 ........................................ 8, 30, 33, 40, 48, 60
§ 123.3 ........................................ 9
§ 123.4 ........................................ 8, 33, 46, 48, 59-60
§ 123.5 ........................................ 9, 32, 40, 48, 54

**Miscellaneous Authorities**

3 Williston on Contracts § 7:7 (4th ed. Westlaw May 2025) ............ 26-27

Mem. from R. Mills, Comm'r, NYSED to Presidents of Bds. of Educ. & Superintendents of Pub. Schs. (Apr. 5, 2001), http://www.nysed.gov/sites/default/files/programs/indigenous-education/public-schools-use-of-native-american-names-symbols-and-mascots.pdf ........................................ 5

**Miscellaneous Authorities** **Page(s)**

Mem. from J. Baldwin, Senior Deputy Comm'r, NYSED to All Sch. Dists. (Nov. 17, 2022), https://www.nysed.gov/sites/default/files/programs/main/indigenous-native-american-mascot-memo.pdf .................................. 7

NYSED, *Background and Frequently Asked Questions Regarding Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools* (May 2023), https://www.nysed.gov/sites/default/files/programs/indigenous-education/indigenous-mascot-regulation-background-and-faq.pdf.................................................... 9

Robert Braucher & E. Allan Farnsworth, A.L.I., *Restatement (Second) of Contracts* § 77 (Westlaw Oct. 2024 update) .................... 28

## PRELIMINARY STATEMENT

In 2023, the New York State Education Department (NYSED) issued regulations, known as Part 123, requiring public schools within the State to eliminate the use of Indigenous names, logos, or mascots for school sports teams and purposes other than classroom instruction. 8 N.Y.C.R.R. § 123.1 et seq. Massapequa Union Free School District, which uses the name "Chiefs" and a logo featuring the supposed likeness of a Native American man, refused to comply and instead challenged Part 123 as unconstitutional. When that suit failed based on Massapequa's lack of capacity to challenge the constitutionality of state regulations, Massapequa turned to plaintiff-appellant Native American Guardian's Association (NAGA), a nonprofit organization with the stated mission of opposing restrictions on the use of Native American imagery.

In an illusory agreement (the "Agreement"), NAGA purported to "authorize" Massapequa to use the Chiefs name and logo—even though NAGA possesses no legal interest in the name or logo. In return, Massapequa purported to promise that it would keep using the name and logo and continue its preexisting educational programming on Indigenous

history. But Massapequa could discontinue its performance at any time without consequence.

Two weeks after signing the Agreement, NAGA, together with plaintiff-appellant David Finkenbinder (one of its members), brought this action seeking to invalidate Part 123. Plaintiffs asserted numerous constitutional and statutory claims based primarily on Part 123's alleged interference with the Agreement and sought a preliminary injunction against the regulation's enforcement. The U.S. District Court for the Eastern District of New York (Bulsara, J.) dismissed the complaint for lack of standing and denied plaintiffs' motion for a preliminary injunction as academic. This Court should affirm.

First, plaintiffs lack standing. As the district court correctly determined, the Agreement between NAGA and Massapequa is not a valid contract and is instead an illusory agreement that improperly attempted to circumvent the limits of article III standing. Specifically, NAGA has no rights to the Chiefs name and logo and therefore could not convey any valid consideration when it purported to "authorize" Massapequa to use the Chiefs name and logo. Massapequa's promise to continue using the Chiefs name and logo and continue its preexisting educational programming—

both at Massapequa's sole option—was also meaningless. Because neither side of the Agreement was supported by consideration, it is not a valid contract, and its alleged impairment is not a cognizable injury in fact. Nor do plaintiffs identify any cognizable injury in fact from any other source.

Second, even if this Court were to conclude that plaintiffs established standing, the judgment below should be affirmed on the independent and alternative ground that the complaint fails to state a claim on which relief can be granted. Each of plaintiffs' numerous claims suffers from fundamental pleading deficiencies.

Third, the district court properly denied a preliminary injunction as academic given the complaint's dismissal. In any event, plaintiffs failed to allege any cognizable injury—much less irreparable harm—absent preliminary relief. They have no likelihood of success on their claims. And the equities weigh decisively in defendants' favor because public schools' use of Indigenous names, logos, and mascots harms students by reinforcing stereotypes and prejudices and contributing to a hostile learning environment.

## ISSUES PRESENTED

1. Whether the district court correctly dismissed plaintiffs' claims for lack of standing.

2. Whether the district court's judgment can be affirmed on the independent and alternative ground that the complaint fails to state a claim.

3. Whether the district court correctly denied plaintiffs' motion for a preliminary injunction.

## STATEMENT OF THE CASE

### A. New York State Education Department's Regulations Prohibiting the Use of Indigenous Names, Logos, and Symbols as Mascots

The New York State Constitution directs the Legislature to "provide for the maintenance and support of a system of free common schools" to educate the State's children. N.Y. Const. art. XI, § 1. The Legislature has empowered the Board of Regents, through NYSED, to "establish rules for carrying into effect the laws and policies of the state, relating to education." N.Y. Educ. Law § 207; *see id.* § 101. The Commissioner of Education "is the chief executive officer of the state system of education and of the board of regents." *Id.* § 305(1). School districts are "subject to the visita-

tion of the commissioner," who exercises "general supervision of their boards of education and their management and conduct of all departments of instruction." *Id.* § 309; *see id.* § 305(2).

In 2001, the Commissioner issued a memorandum calling upon public school administrators in New York to discontinue the use of Native American names and symbols as mascots. (A. 39-40.) After carefully considering competing interests, the Commissioner "concluded that the use of Native American symbols or depictions as mascots can become a barrier to building a safe and nurturing school community and improving academic achievement for all students."[1] That determination was based on extensive research and discussion and followed the elimination of Native American mascots at more than 600 secondary and postsecondary schools across the country over the preceding thirty years.[2] Around the same time, the U.S. Commission on Civil Rights similarly encouraged schools to bring an "end to the use

---

[1] Mem. from R. Mills, Comm'r, NYSED to Presidents of Bds. of Educ. & Superintendents of Pub. Schs. at 1 (Apr. 5, 2001), www.nysed.gov/sites/default/files/programs/indigenous-education/public-schools-use-of-native-american-names-symbols-and-mascots.pdf. All websites were last visited April 8, 2026.

[2] *Id.* at 1-2.

of Native American images and team names." (Appendix for Appellees (D.A.) 87.)

After the Commissioner's 2001 memorandum, many school districts in the State retired their Indigenous names, logos, and mascots, but others did not. (D.A. 7.) In 2021, Cambridge Central School District in upstate New York reinstated its Indigenous team name and logo after having previously retired them. (D.A. 7.) The Commissioner sustained a challenge to that decision, finding that Cambridge had not sufficiently explained its change in position. (D.A. 29-30.) The Commissioner also concluded that Cambridge's continued use of the Indigenous name and logo ran counter to the prevailing professional opinion that the use of Indigenous mascots, symbols, and imagery negatively affects both Indigenous and non-Indigenous students by reinforcing stereotyping and prejudices. (D.A. 30-31.) In addition, the Commissioner observed that Cambridge's actions risked violating New York's Dignity for All Students Act, which prohibits "the creation of a hostile environment . . . that reasonably causes or would reasonably be expected to cause . . . emotional harm to a student," including acts based on a person's actual or perceived race, national origin, or ethnic group, Educ. Law § 11(7); *see id.* § 12. (D.A. 30.) In June 2022, a New

York State court upheld the Commissioner's ruling about Cambridge. *Matter of Cambridge Cent. Sch. Dist. v. New York State Educ. Dep't*, Index No. 902161-22 (Sup. Ct. Albany County June 22, 2022) (reproduced at D.A. 16-24), *appeal dismissed*, 222 A.D.3d 1068 (3d Dep't 2023).

After the state court's ruling in the *Cambridge* case, NYSED issued a memorandum explaining that the court's decision had confirmed, consistent with the Commissioner's 2001 memorandum, that public school districts may not use Native American mascots. (D.A. 8; *see* A. 40-41.[3]) The memorandum signaled NYSED's intent to promulgate regulations to that end. (*See* A. 41.) In December 2022, NYSED commenced a proposed rulemaking. (D.A. 7.) After a public comment period (*see* D.A. 10-14), the Board of Regents approved Part 123 of the Regulations of the Commissioner of Education, 8 N.Y.C.R.R. §§ 123.1-123.5.

Part 123, which became effective in May 2023, provides that "no public school in the State of New York may utilize or display an Indigenous name, logo, or mascot other than for purposes of classroom instruction."

---

[3] *See also* Mem. from J. Baldwin, Senior Deputy Comm'r, NYSED to All Sch. Dists. (Nov. 17, 2022), https://www.nysed.gov/sites/default/files/programs/main/indigenous-native-american-mascot-memo.pdf.

8 N.Y.C.R.R. § 123.2. The regulation defines "Indigenous name, logo, or mascot" to mean "a name, symbol, or image that depicts or refers to Indigenous persons, tribes, nations, individuals, customs, symbols, or traditions, including actual or stereotypical aspects of Indigenous cultures, used to represent a public school, including but not limited to such school[']s sports teams." *Id.* § 123.1. The definition "does not include a public school, school building, or school district named after an Indigenous tribe." *Id.* The regulation contains exceptions for the sports teams of tribal nations composed of tribal members, *id.* § 123.4(a), and for any public school that, as of Part 123's effective date, had entered into a written agreement with a federally or state-recognized tribe permitting "the use of an Indigenous name, mascot, or logo that is culturally affiliated with such tribe," *id.* § 123.4(b). In connection with such agreements, public schools may not "offer or accept any money, consideration, or thing of value." *Id.*

Part 123 also sets forth a timeline for implementation. The regulation requires school boards to have adopted resolutions by the end of the 2022-2023 school year committing to eliminate Indigenous names, logos, and mascots and establishing a plan for doing so by the end of the 2024-2025

school year. *Id.* § 123.3(a). The Commissioner can extend these deadlines for good cause. *Id.* § 123.3(b).

Finally, Part 123 contains a prohibition on the use or promotion of Indigenous names, logos, or mascots by school officers and employees "when located on school property or at a school function." *Id.* § 123.5. That provision contains a limited exception for members of tribal nations. *Id.*

NYSED issued guidance to accompany Part 123 to provide additional background information and address frequently asked questions.[4] The guidance explains that Part 123 prohibits public schools from using names, logos, or mascots with "any connection to Indigenous peoples in the past or present, including logos that incorporate symbols associated with Indigenous peoples such as feathers, historical weapons like tomahawks or spears, or logos utilizing stylization generally attributable to or in association with Indigenous peoples such as feathers or traditional Indigenous clothing."[5]

---

[4] NYSED, *Background and Frequently Asked Questions Regarding Part 123 of the Regulations of the Commissioner of Education Relating to Prohibiting the Use of Indigenous Names, Mascots, and Logos by Public Schools* (May 2023) ("Part 123 FAQ"), https://www.nysed.gov/sites/default/files/programs/indigenous-education/indigenous-mascot-regulation-background-and-faq.pdf.

[5] *Id.* at 6.

Numerous other States similarly limit public schools' use of Indigenous names, logos, and mascots. *See, e.g.*, Cal. Educ. Code § 221.3; Colo. Rev. Stat. Ann. § 22-1-133; Conn. Gen. Stat. Ann. § 3-55j(*l*); Me. Rev. Stat. Ann. tit. 20-A, § 12; Minn. Stat. § 121A.041; Nev. Rev. Stat. Ann. § 388.045; Vt. Stat. Ann. tit. 16, § 568; Wash. Rev. Code Ann. § 28A.320.296.

### B. Massapequa Union Free School District's Lawsuit Challenging Part 123

Massapequa is a hamlet of Nassau County and is named for the Native Americans who historically occupied the area. (A. 29-30.) Beginning in 1925, the Massapequa Avenue School began using the name "Chiefs" and a logo depicting a Native American man in full headdress.[6] (A. 31-32.) When Massapequa High School opened in 1955, it adopted the same name and logo, which has been used ever since. (A. 31.)

In September 2023, shortly after Part 123 became effective, Massapequa Union Free School District, its school board, and an individual

---

[6] Although the logo is intended to depict the historical leader Sachem Tackapausha (A. 31), the preliminary injunction record shows that the image is a caricature that bears no resemblance to Tackapausha and inaccurately depicts him with a style of headdress generally associated with the Plains Indians (D.A. 112-113).

school board member brought suit in the U.S. District Court for the Eastern District of New York seeking to enjoin the regulation's enforcement. In March 2025, the district court (Brodie, J.) dismissed the claims of the school district and school board because, as municipal entities, they lacked capacity to challenge the constitutionality of state regulations. (SPA 10-11.) The district court also dismissed the individual school board member's claims but granted her leave to replead additional facts to support the First Amendment claims asserted in her personal capacity.[7] (SPA 11-12.)

---

[7] The dismissal order simultaneously resolved similar claims in other lawsuits brought by Connetquot, Wantagh, and Wyandanch School Districts, which the district court deemed to be related. *Massapequa Union Free Sch. Dist. v. New York State Bd. of Regents*, No. 2:23-cv-07052, 2025 WL 929710, at *1-2 (E.D.N.Y. Mar. 27, 2025). The Wantagh plaintiffs appealed the dismissal of their claims, and that appeal remains pending in this Court (No. 25-1136).

### C. Massapequa's Agreement with Native American Guardian's Association (NAGA)

In May 2025, shortly after the district court's dismissal order and two years after Part 123's effective date, Massapequa entered into an Agreement with plaintiff NAGA. (A. 17.) NAGA is a nonprofit organization founded in 2017 and headquartered in North Dakota. Its mission includes opposing state restrictions on the use of Native American imagery. (A. 15-16.)

The Agreement observes at the outset that Massapequa is subject to Part 123 and thus must "discontinue utilizing the name, image and likeness ('NIL') of a Native American chief as the District's symbol and to discontinue utilizing the name 'Chiefs.'" (A. 63.) Despite this preexisting state law prohibition, NAGA purports to "permit, consent to, support, and authorize the District's continued use of the Indigenous NIL." (A. 63-64.) But the Agreement does not state—and plaintiffs do not allege—that NAGA has any legal right or interest in the Chiefs name and logo, which Massapequa had used for many decades before NAGA was founded. In exchange for this purported "authorization," Massapequa promises to continue using the Chiefs name and logo and to continue its "current educational programming and instruction concerning Native American history

and culture." (A. 64.) Massapequa also agrees to "meet with a NAGA representative . . . at least once per year to review and discuss the educational programming and instruction." (A. 64.)

The Agreement contains no enforcement mechanism. Instead, the Agreement states that if Massapequa discontinues its educational programming or stops using the Chiefs name and logo, NAGA's "authorization for the District's continued use of its Indigenous NIL rights will automatically be withdrawn." (A. 64.) And the Agreement further states that "NAGA . . . will have no cause of action of any kind and nature to compel or require the District to provide any kind of educational programming or instruction." (A. 64.) In addition, either party may unilaterally terminate the Agreement on thirty days' notice. (A. 64.)

## D. The Proceedings Below

Two weeks after executing the Agreement, NAGA and one of its members, David Finkenbinder, brought this lawsuit in the Eastern District of New York challenging Part 123.[8] (A. 11-62.) The complaint names the Board of Regents and its members as defendants and alleges numerous constitutional and statutory violations under federal and state law. (A. 45-59.) The complaint seeks a declaration that Part 123 is unlawful and an injunction preventing its enforcement. (A. 60-61.) Plaintiffs subsequently moved for a preliminary injunction against the enforcement of Part 123 during the pendency of this litigation. (A. 92-93.)

[8] At the same time that NAGA and Finkenbinder filed their lawsuit, the plaintiffs in the *Massapequa* case moved for leave to amend their complaint to add new factual allegations related to the Agreement and numerous additional claims. (*See* SPA 4.) The district court deemed this case and the *Massapequa* case to be related. (A. 5.) In the same memorandum and order resolving defendants' motion to dismiss in this case, the court denied the motion to amend in *Massapequa*, except with respect to the individual school board member's First Amendment claims. (SPA 90-92.) Shortly thereafter, the individual school board member voluntarily withdrew her claims. Notice of Dismissal Without Prejudice of Claims of Jeanine Caramore in her Individual Capacity, *Massapequa*, No. 2:23-cv-07052 (E.D.N.Y. Dec. 12, 2025), ECF No. 86. The school district and board filed an appeal, which remains pending in this Court (No. 25-3151).

The district court (Bulsara, J.) granted defendants' motion to dismiss the complaint and denied plaintiffs' motion for a preliminary injunction. (SPA 1-94.) As a preliminary matter, the court held that the Eleventh Amendment barred plaintiffs' state law claims against all defendants, as well as plaintiffs' federal constitutional claims against the Board of Regents. (SPA 35-36.) The court then proceeded to dismiss plaintiffs' remaining claims for lack of standing.[9] (SPA 90-92.)

*First*, the court held that NAGA could not establish standing on the theory that Part 123 impaired its Agreement with Massapequa.[10] (*See* SPA 50-57.) The court concluded that the Agreement is illusory and thus cannot give rise to any cognizable injury in fact. (SPA 61.) Although NAGA purported to authorize Massapequa to use the Chiefs name and logo, the court explained, this promise could not serve as valid consideration because NAGA "does not own, license, or have any relationship to the

[9] The district court dismissed the following claims for lack of standing: plaintiffs' federal equal protection, due process, free speech, dormant Commerce Clause, Indian Commerce Clause, and § 1981 claims against the individual Board of Regents members in their official capacities, and plaintiffs' Title VI claim against the Board of Regents. (*See* SPA 92.)

[10] The Agreement was the primary source of NAGA's alleged injury, except as to the equal protection and First Amendment claims, for which NAGA claimed to suffer additional injuries. (*See* SPA 57.)

current Chiefs mascot." (SPA 53.) Similarly, the court observed, "Massapequa's promises to conduct educational programing and to continue to use the Chiefs mascot" were meaningless because they could be discontinued at Massapequa's sole option. (SPA 54.) At bottom, the court found that the Agreement was a "facile and thinly veiled attempt to circumvent the limits on standing." (SPA 50 (alteration and quotation marks omitted).) In any event, the court further held, NAGA did not plausibly allege that Part 123 operates to invalidate the Agreement (or any contracts). (SPA 56.)

*Second*, the court concluded that NAGA did not plausibly allege an injury in fact arising from any other source. For example, NAGA did not have standing to bring claims under the First Amendment, Due Process Clause, or Title VI based on Part 123's regulation of public schools like Massapequa, which was not a plaintiff in NAGA's lawsuit. (SPA 58, 70, 81-82.) And NAGA suffered no injury under the Equal Protection Clause based on the abstract allegation that it was "deprived of the benefit of Massapequa's use of the Chiefs mascot." (SPA 66.) Moreover, NAGA failed to allege any economic injury for purposes of its dormant Commerce Clause claim. (SPA 74.) And because NAGA is not a tribal nation and did not

otherwise allege "some relationship to activities on tribal land," it lacked standing to assert a claim under the Indian Commerce Clause.[11] (SPA 76-78.)

*Third*, the court rejected NAGA's attempt to assert associational standing on behalf of its members. As the court explained, an organization cannot assert the rights of its members for claims brought under § 1983. (SPA 57-58.) And plaintiffs' allegation that certain unidentified members were "directly impacted" by Part 123 was entirely conclusory. (SPA 82 (quotation marks omitted).)

*Fourth*, the court determined that plaintiff Finkenbinder lacked standing for largely the same reasons. (*See, e.g.*, SPA 68, 70, 74, 78.) Like NAGA, Finkenbinder lacked any connection to Massapequa and was "not directly regulated by Part 123." (SPA 60.) The court also rejected Finkenbinder's attempt to rely on a theory of taxpayer standing. (SPA 60-61.)

Having dismissed plaintiffs' claims without prejudice based on Eleventh Amendment immunity and lack of standing, the Court set a

[11] The court dismissed plaintiffs' 42 U.S.C. § 1981 claim because plaintiffs failed to articulate "any theory of § 1981 injury." (SPA 87.)

deadline of December 29, 2025, for the filing of any amended complaint. (SPA 91.) Rather than file an amended complaint by that deadline, plaintiffs filed this appeal. *See* Br. for Pls.-Appellants (Br.) at 17.

## STANDARD OF REVIEW

This Court reviews de novo the dismissal of a complaint for lack of standing under Federal Rule of Civil Procedure 12(b)(1). *Fund Liquidation Holdings LLC v. Bank of Am. Corp.*, 991 F.3d 370, 379 (2d Cir. 2021).

## SUMMARY OF ARGUMENT

I. The district court correctly dismissed the complaint for lack of standing as to both NAGA and Finkenbinder.

A. NAGA's primary theory of standing is that Part 123 impaired its Agreement with Massapequa. But the Agreement does not support NAGA's standing because it is wholly illusory, as the district court correctly concluded. Under the Agreement, NAGA purports to authorize Massapequa's use of the Chiefs name and logo. Yet NAGA has no rights to this name or logo, which Massapequa had used for many decades before NAGA was founded, making the promise an empty gesture. Similarly, although Massapequa promises to continue using the Chiefs name and

logo and to continue providing its current educational programming on Indigenous history, Massapequa's performance under the Agreement is entirely optional. Because the Agreement contains only illusory promises, it is not a valid contract and its alleged impairment does not give rise to any cognizable injury in fact that could support NAGA's standing.

NAGA fails to plausibly allege any other injury. Part 123 restricts public schools' use of Indigenous names, logos, or mascots outside of a classroom setting or school name. These restrictions do not apply to NAGA, which may continue to pursue educational partnerships with public schools. And the alleged intangible harm arising from NAGA's disagreement with Part 123 is too generalized and abstract to constitute an injury in fact for article III standing. NAGA also fails to plausibly allege that its response to Part 123 represents a diversion from its stated mission to oppose restrictions on Indigenous imagery.

Nor does NAGA have associational standing to assert claims on behalf of its members. NAGA has waived any challenge to the district court's ruling that a membership organization cannot assert § 1983 claims on behalf of its members, because NAGA failed to raise any such argument

in its opening brief on appeal. In any event, NAGA fails to identify any member that has suffered a concrete and particularized injury.

B. Finkenbinder also lacks standing. Part 123 does not impose any cognizable injury on him because the regulation does not restrict his speech or subject him to any race-based classification. And Finkenbinder's status as a state taxpayer does not give him standing to challenge Part 123.

C. The district court also made independent rulings that plaintiffs lack standing to bring certain of their claims for claim-specific reasons. Plaintiffs waived any challenge to these rulings by failing to raise any such challenge in their opening brief on appeal. In any event, each of these claim-specific rulings was correct. Specifically, the district court properly ruled that: (i) plaintiffs improperly premise their due process claim on harms to third parties; (ii) plaintiffs' dormant Commerce Clause claim is unsupported by any allegation of economic injury; (iii) plaintiffs do not allege any connection to tribal lands for purposes of their Indian Commerce Clause claim; and (iv) plaintiffs' complaint mentions 42 U.S.C. § 1981 only in passing and thus fails to establish standing to assert a claim thereunder.

II. This Court may affirm on the alternative ground that the complaint fails to state a claim. Each claim is fundamentally deficient.

These deficiencies are apparent from the record and thus provide independent grounds for affirmance.

A. Plaintiffs fail to state a claim under the Equal Protection Clause or Title VI because they fail to plausibly allege unlawful discrimination based on § 123.4(b)'s tribal-approval provision or § 123.1's definition of "Indigenous name, logo, or mascot." Section 123.4(b), which allows public schools to use Indigenous names, logos, or mascots with the approval of a culturally affiliated tribal nation, does not prevent Indigenous-affiliated organizations from entering into contracts with public schools. And assuming, as plaintiffs allege, that § 123.1's prohibition on Indigenous names, logos, and mascots imposes a racial classification, strict scrutiny is satisfied because Part 123 is narrowly tailored to accomplish its goal of eliminating discrimination and stereotyping in public schools.

B. For similar reasons, plaintiffs fail to state a claim under 42 U.S.C. § 1981. This claim fails at the outset because it requires an impaired contractual relationship under which the plaintiff has rights, but plaintiffs do not have any actual rights under the illusory Agreement. Nor do plaintiffs attempt to explain how § 123.4(b)—which governs the terms on which public schools may obtain the consent of a tribal nation to use an

Indigenous name, logo, or mascot—implicates the right of third parties to contract or discriminates along racial lines.

C. Plaintiffs fail to state any First Amendment claim. To the extent that Part 123 regulates speech, it regulates only the speech of public school districts and their employees and thus does not abridge the speech of NAGA or NAGA's members. Moreover, plaintiffs' overbreadth challenge fails because Part 123's regulation of public schools' use of Indigenous names, logos, and mascots does not impair any protected speech, and plaintiffs do not plausibly allege that any other provision of Part 123 implicates a substantial amount of protected speech in relation to its plainly legitimate sweep.

D. Plaintiffs fail to state a claim that Part 123 is void for vagueness under the Due Process Clause. Plaintiffs admit that the regulation plainly applies to Massapequa's name and logo, and this admission disposes of their vagueness argument. In any event, Part 123 is clear and does not encourage arbitrary enforcement.

E. Plaintiffs fail to state a dormant Commerce Clause claim because they do not plausibly allege that Part 123 implicates a competitive market or favors in-state commercial interests.

F. Plaintiffs fail to state an Indian Commerce Clause claim because the claim does not appear in the complaint and, in any event, plaintiffs do not plausibly allege that Part 123 implicates activities on tribal lands.

III. The district court correctly denied plaintiffs' motion for a preliminary injunction as academic after dismissing their complaint for lack of standing. The Court should affirm the denial on that basis. However, if the Court does not agree with the dismissal of plaintiffs' complaint, it should nonetheless affirm the denial of the preliminary injunction motion on multiple, independent grounds.

First, plaintiffs' inability to identify any cognizable injury that Part 123 imposes on them defeats their assertion of irreparable harm absent preliminary relief. Second, plaintiffs are exceedingly unlikely to succeed on the merits of their claims because they lack standing and fail to state any claim. Third, the equities and public interest weigh decisively in defendants' favor because enjoining defendants from implementing Part 123 will harm public school students by perpetuating racial discrimination and stereotyping.

# ARGUMENT

On appeal, plaintiffs do not challenge the district court's dismissal, based on Eleventh Amendment immunity, of their state law claims against all defendants and their federal claims against the Board of Regents. (*See* SPA 35-36.) For the reasons below, the district court correctly dismissed plaintiffs' remaining claims for lack of standing.

## POINT I

### THE DISTRICT COURT CORRECTLY DISMISSED PLAINTIFFS' CLAIMS FOR LACK OF STANDING

To establish article III standing, "a plaintiff must demonstrate (i) that [the plaintiff] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *FDA v. Alliance for Hippocratic Med.*, 602 U.S. 367, 380 (2024); *see Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). A plaintiff must demonstrate standing as to each claim asserted and for each form of relief

sought.[12] *Davis v. FEC*, 554 U.S. 724, 734 (2008). Here, the district court correctly held that plaintiffs NAGA and Finkenbinder lack standing to pursue any of their claims.

### A. NAGA Lacks Standing.

On appeal, NAGA asserts standing based on four alleged injuries: (i) the impairment of its Agreement with Massapequa, (ii) the impairment of its dignitary and expressive interests, (iii) the diversion of its organizational resources, and (iv) the impairment of its members' rights. NAGA fails to plausibly allege standing under any of these theories.

---

[12] Plaintiffs misread *Bell v. Hood* to suggest (Br. at 31) that a dismissal for lack of subject-matter jurisdiction is appropriate *only* for claims that are "wholly insubstantial and frivolous," 327 U.S. 678, 682-83 (1946). There are many other reasons that a claim might be dismissed for lack of subject-matter jurisdiction—including for failure to allege the elements of article III standing.

#### 1. NAGA fails to establish standing based on its illusory Agreement with Massapequa.

The district court correctly held that NAGA's Agreement with Massapequa is illusory and unenforceable, and therefore its supposed impairment does not plausibly allege any cognizable injury in fact. *See Alliance for Hippocratic Med.*, 602 U.S. at 381 (injury in fact "must be real and not abstract"); *Fair Emp. Counsel of Greater Wash., Inc. v. BMC Mktg. Corp.*, 28 F.3d 1268, 1271 (D.C. Cir. 1994) (loss of opportunity to enter into unenforceable contract not a cognizable injury). Instead, the Agreement is a blatant and improper attempt to "manufacture standing." (SPA 50.)

Under New York law, which governs the Agreement (A. 65), an illusory contract is "[a]n agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation." *Lend Lease (US) Constr. LMB Inc. v. Zurich Am. Ins. Co.*, 28 N.Y.3d 675, 684 (2017) (quotation marks omitted). An illusory promise cannot serve as consideration because "it would impose no obligation, since the promisor always has it within the promisor's power to keep the promise and yet escape performance of anything detrimental to itself or beneficial to the promisee." 3 Williston on Contracts § 7:7 (4th ed. Westlaw May 2025). In other words, "where the promisor may perform or not, solely on the condi-

tion of whim, the promise will not serve as consideration." *Id.* And "where there is no consideration flowing from one party to a contract, . . . there is no contract." *Manufacturers Tr. Co. v. Kennedy*, 291 F.2d 460, 469 (2d Cir. 1961); *see Murray v. Northrop Grumman Info. Tech., Inc.*, 444 F.3d 169, 178 (2d Cir. 2006).

Here, both parties to the Agreement exchanged only illusory promises. On one side of the supposed bargain, NAGA purports to authorize Massapequa to use the Chiefs name and logo. (A. 64-65.) But NAGA has no legal or proprietary right to the Chiefs name and logo, as NAGA concedes. *See* Br. at 32. Indeed, Massapequa had already been using the Chiefs name and logo for decades before NAGA was founded in 2017. (*See* A. 15, 31.) As the district court explained, NAGA's supposed authorization therefore "imposes no burden on NAGA, however measured, because the Chiefs mascot is not theirs to authorize, license, or convey." (SPA 53.) Thus, NAGA's promise is no more than "a gratuitous gesture without any legal effect." (SPA 53.)

On the other side of the supposed bargain, Massapequa promises to continue using the Chiefs name and logo and to continue providing the district's preexisting educational programming. (A. 64.) But Massapequa's

performance under the Agreement is entirely optional. *See* Robert Braucher & E. Allan Farnsworth, A.L.I., *Restatement (Second) of Contracts* § 77 cmt. a (Westlaw Oct. 2024 update) ("Words of promise which by their terms make performance entirely optional with the 'promisor' do not constitute a promise."). For example, if Massapequa decides to stop using the Chiefs name and logo, NAGA's authorization to use the name and logo "will automatically be withdrawn" and no breach results. (*See* A. 64; SPA 54.) Moreover, if Massapequa decides to stop its educational programming, NAGA has "no cause of action of any kind and nature to compel or require the District to provide any kind of educational programing or instruction."[13] (A. 64; *see* SPA 54.) Indeed, nothing in the Agreement stops Massapequa from continuing to utilize the name and logo without NAGA's consent. And even if it were possible to breach the Agreement, the breaching party could simply cancel the contract unilaterally. (*See* A. 64; SPA 55.) Massapequa's "unlimited right to decide later the nature or extent of [its]

---

[13] The Agreement does not provide that Massapequa will continue "providing educational context to the 'Chiefs' name" for as long as Massapequa continues to use it. *Contra* Br. at 32.

performance . . . in effect destroys the promise and makes it merely illusory." *See Chiapparelli v. Baker, Kellogg & Co.*, 252 N.Y. 192, 200 (1929).

Contrary to plaintiffs' contentions, the district court did not hold that contracts cannot create enforceable rights absent "trademark ownership" (Br. at 32), that a "profit motive" is necessary (*id.* at 34 (quotation marks omitted)), or that valid consideration must be "financially quantifiable" (*id.* at 35). Instead, the court correctly applied the well-established principle that consideration "'must be of *some* value, or at least not merely empty formal words.'" (SPA 53 (emphasis added) (quoting *Nassau Supply Co. v. Ice Serv. Co.*, 252 N.Y. 277, 280 (1929)).) The Agreement here is plainly empty words, with no valid consideration exchanged.

Plaintiffs acknowledge that the Agreement must be valid to support an injury in fact. *See* Br. at 37 (describing alleged injury as the "impairment and nullification of a valid agreement"). Yet they make little attempt to argue that the Agreement is supported by any valid consideration. Instead, plaintiffs observe that, under the Agreement, Massapequa did not license the Chiefs name and logo to NAGA. *See id.* at 32, 34. While true, that observation is a non sequitur because, as explained, NAGA's purported authorization to use the Chiefs name and logo does not operate to confer

any "right" or "benefit" to Massapequa, or result in any "detriment" or "loss" to NAGA, as required to constitute valid consideration. *See Hamer v. Sidway*, 124 N.Y. 538, 545 (1891) (quotation marks omitted).

Next, plaintiffs argue that the Agreement "allows NAGA to provide cultural consultation, educational collaboration, and structured programming" (Br. at 39) and that Part 123 "disrupts that mission by preventing the collaborative activities" (*id.* at 40). There are three problems with this argument. First, the Agreement imposes no obligation on NAGA to provide consultation services to Massapequa. Rather, the annual meeting requirement is Massapequa's obligation—as plaintiffs recognize elsewhere in their brief, *id.* at 33. (*See* A. 64 (providing that Massapequa "shall meet with a NAGA representative").) Second, and in any event, Part 123 does not prevent NAGA from providing educational consultation. Indeed, Part 123 expressly preserves schools' ability to "utilize or display an Indigenous name, logo, or mascot . . . for purposes of classroom instruction." 8 N.Y.C.R.R. § 123.2. Plaintiffs' repeated assertion that Part 123 "singl[es] out and ban[s] the use of Native American imagery in a school environment" is simply false. *Contra* Br. at 37; *see also id.* at 41, 44. Third, if Massapequa were to decide in the future to stop its educational program-

ming or to stop consulting with NAGA, any injury that would result to NAGA from Massapequa's independent choices would not be traceable to Part 123 or redressable by judicial relief. *See Murthy v. Missouri*, 603 U.S. 43, 73 (2024); *Doe v. Hochul*, 139 F.4th 165, 187 (2d Cir. 2025).

NAGA's failure to plausibly allege an injury in fact based on the Agreement forecloses all of its claims except its equal protection and First Amendment claims, for which NAGA asserts additional theories of injury. *See* Br. at 43-47. (*See* SPA 57.) Those theories lack merit for the reasons explained below.

#### 2. NAGA fails to allege any other injury under the Equal Protection Clause or the First Amendment.

Solely for its equal protection and First Amendment claims, NAGA argues that it has standing based on alleged injuries to its "dignitary, expressive, and equality interests." Br. at 43; *see id.* at 29, 31. But this argument fails.

To establish article III standing for an equal protection claim, a plaintiff must prove that "he personally would have been subject to the

discriminatory terms of the law."[14] *MGM Resorts Int'l Glob. Gaming Dev., LLC v. Malloy*, 861 F.3d 40, 50 (2d Cir. 2017); *see United States v. Hays*, 515 U.S. 737, 743-44 (1995). Similarly, a plaintiff lacks standing to assert a free speech claim under the First Amendment based on "*someone else's* censorship" unless the plaintiff has a "concrete, specific connection to the speaker." *Murthy*, 603 U.S. at 75.

Here, NAGA failed to allege any such equal protection or free speech injuries because NAGA is not regulated by Part 123. Part 123 prevents *public schools* from using Indigenous names, logos, and mascots for school sports teams and activities other than classroom instruction. *See* 8 N.Y.C.R.R. §§ 123.1-123.2. And it prohibits "*school officers and employees* when located on school property or at a school function from utilizing or promoting any Indigenous name, logo, or mascot." *Id.* § 123.5 (emphasis added). It does not, as plaintiffs argue, "eliminate[] symbolic expression from traditional school forums" or "control[] expressive environment[s] in which students and affiliated groups communicate." *Contra* Br. at 45.

[14] This Court has confirmed that, under *Heckler v. Mathews*, 465 U.S. 728 (1984), a plaintiff must demonstrate some actual, imminent harm in order to challenge an allegedly discriminatory statute. *MGM Resorts*, 861 F.3d at 49-50. *Contra* Br. at 45-46.

Indeed, nothing in Part 123 prevents NAGA from utilizing or promoting Indigenous names, symbols, or mascots. Nor is NAGA prevented from engaging in efforts to educate students concerning Indigenous culture and identity, or from entering into agreements with public schools to that end. *Contra id.* at 42, 44.

Plaintiffs err in arguing that Part 123 denies NAGA "the ability to enter into and maintain agreements with public school districts on the same terms as non-Indigenous organizations." *Contra id.* at 44. Section 123.4(b) provides that public schools may use an Indigenous name, logo, or mascot that is affiliated with a recognized tribal nation with that tribal nation's written approval. 8 N.Y.C.R.R. § 123.4(b). The ability to authorize the use of an Indigenous name, logo, or mascot rests solely with tribal nations and no other entity—regardless of cultural affiliation. And nothing in § 123.4(b) purports to invalidate or prevent the formation of any contract or agreement. (*See* SPA 56-57.) Although Part 123 limits public schools' ability to continue using Indigenous logos and mascots, 8 N.Y.C.R.R. § 123.2, NAGA is not injured by that limitation because it has no right to license any such logo or mascot. See *supra* at 27.

NAGA also fails to identify any concrete connection to Massapequa that would allow it to assert a First Amendment claim based on Part 123's regulation of Massapequa's speech. NAGA's illusory contract with Massapequa provides no such connection (see *supra* at 26-30), and no other connection is alleged. Instead, NAGA impermissibly relies on the generalized grievance that Part 123 purportedly fails to comply with the Constitution. *See Lujan*, 504 U.S. at 575. In any event, municipal corporations such as school districts have no enforceable First Amendment rights against the State. *See Ysursa v. Pocatello Educ. Ass'n*, 555 U.S. 353, 363 (2009).

The remaining "intangible harm" on which NAGA seeks to rely (Br. at 43) amounts to nothing more than "the psychological consequence presumably produced by observation of conduct with which one disagrees." *See Valley Forge Christian Coll. v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 485 (1982). But individuals do not suffer a concrete and particularized injury by observing schools "declining

to adopt certain mascots."[15] Order at 15, *Marez v. Redhorse*, No. 1:21-cv-02941 (D. Colo. May 5, 2022) (reproduced at D.A. 34-63); *see also Spokeo, Inc. v. Robins*, 578 U.S. 330, 341 (2016) (intangible harm must have "a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts").

#### 3. NAGA fails to allege the diversion of organizational resources.

There is no merit to NAGA's contention that Part 123 forces the organization to "divert time, resources, and organizational effort." *See* Br. at 41. To establish standing on such a theory, an organization must identify "current activities from which it diverted resources." *Connecticut Citizens Def. League, Inc. v. Lamont*, 6 F.4th 439, 447 (2d Cir. 2021) (quotation marks omitted). But where an organization's "current activities" include opposing the legislation at issue through litigation, there is no such diversion. *Id.* (quotation marks omitted).

---

[15] This Court has also observed it is "doubtful" that a corporate entity could establish standing based on alleged "psychic or emotional harm." *MGM Resorts*, 861 F.3d at 50.

Here, NAGA argues that Part 123 has caused it to "respond to the regulatory prohibition and preserve its relationships within the School District and the state at large." Br. at 41. But the entire purpose of NAGA's Agreement with Massapequa was to oppose Part 123, as plaintiffs concede. *See id.* at 40.[16] The Agreement itself recites as a premise the enactment of Part 123. (A. 63.) And the current litigation is consistent with NAGA's stated mission to oppose "attempts by states like New York to ban Native images." (A. 16; *see* A. 243 (stating that part of NAGA's mission is to "oppose name bans").) Because NAGA's response to Part 123 is part and parcel of its organizational mission and "not a departure from [its] usual activities," the response does not constitute an injury in fact.[17] *See Connecticut Citizens Def. League*, 6 F.4th at 447.

---

[16] An affidavit submitted in connection with NAGA's motion for a preliminary injunction acknowledged that the Agreement was part of an attempt to resist Part 123 and explained that NAGA simultaneously prepared a petition to the U.S. Department of Education alleging Title VI violations in connection with Part 123. (*See* A. 238-239.)

[17] Plaintiffs misplace their reliance (Br. at 40-41) on *Students for Fair Admissions, Inc. v. President & Fellows of Harvard College*, which involved an organization's standing to sue in a representational capacity on behalf of its members. *See* 600 U.S. 181, 199-201 (2023). While the Supreme Court described that theory of standing as "organizational standing," *see id.*, this Court uses the term "associational standing" to refer to the same concept,

(*continued on the next page*)

### 4. NAGA lacks associational standing to sue on behalf of its members.

NAGA also lacks associational standing to assert claims on behalf of its members. To establish associational standing, the organization must show that: (i) "its members would otherwise have standing to sue in their own right"; (ii) "the interests it seeks to protect are germane to the organization's purpose"; and (iii) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Do No Harm v. Pfizer Inc.*, 126 F.4th 109, 118 (2d Cir. 2025) (quotation marks omitted). NAGA fails to establish the first and third prongs here, and each deficiency independently serves to defeat associational standing.

Plaintiffs' opening brief on appeal does not address the district court's ruling that NAGA cannot pursue § 1983 claims on its members' behalf (SPA 57-58, 64 n.23), so any challenge to that ruling has been waived, *see Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009). Regardless, the ruling was correct: "'it is the law of this Circuit that an organization does not have

---

while using the term "organizational standing" to refer to standing based on an organization's own injuries, *see, e.g.*, *Citizens United to Protect Our Neighborhoods v. Village of Chestnut Ridge*, 98 F.4th 386, 395 (2d Cir. 2024). As explained in the following subsection, NAGA also fails to establish associational standing, as this Court uses that term.

standing to assert the rights of its members in a case brought under 42 U.S.C. § 1983.'" *A.H. ex rel. E.H. v. New York State Dep't of Health*, 147 F.4th 270, 277 n.2 (2d Cir. 2025) (quoting *Nnebe v. Daus*, 644 F.3d 147, 156 (2d Cir. 2011)). This determination alone forecloses NAGA from pursuing, under a theory of associational standing, its constitutional and statutory claims asserted under § 1983.

In any event, NAGA lacks associational standing for the independent reason that it fails to establish that its members have suffered any "particularized" injury—i.e., an injury that affects members "in a personal and individual way." *See Lujan*, 504 U.S. at 560 n.1. NAGA's allegations concerning its members' standing are threadbare. The complaint alleges merely that NAGA's members "include Native American students, parents, educators, and community leaders directly impacted by the enforcement of Part 123 in the State of New York." (A. 16.) But this allegation is entirely conclusory, unsupported by plausible factual allegations suggesting that any of NAGA's individual members are actually affected by the regulation. *See Connecticut Citizens Def. League, Inc. v. Thody*, No. 23-724, 2024 WL 177707, at *3 (2d Cir. Jan. 17, 2024) (no associational standing based on "generic and conclusory" allegation). In other words, NAGA's members are

"concerned bystanders" raising only generalized grievances. *See Hollingsworth v. Perry*, 570 U.S. 693, 707 (2013) (quotation marks omitted).

For example, the complaint does not allege that any NAGA member is a public school employee subject to the restrictions contained in § 123.5 (*contra* Br. at 45), nor that any member has a connection to Massapequa or New York public schools. The complaint also does not allege how any NAGA member is "subject[ed] to a race-based classification," or prevented from engaging in "educational collaboration" or other forms of protected expression. *Contra* Br. at 41. Nor does the complaint allege that any NAGA member engages in economic activities affected by Part 123. Because NAGA has failed to demonstrate that any member has standing, it may not sue on its members' behalf. *See Do No Harm*, 126 F.4th at 118.

## B. Finkenbinder Lacks Standing.

Finkenbinder attempts to establish standing based on the alleged suppression of his free expression, the alleged violation of his equal protection rights, and his status as a taxpayer. Br. at 47-50. Each of these three theories is meritless.

First, Finkenbinder's expression is not regulated by Part 123, which prohibits only public schools and public school employees from using and promoting Indigenous names, logos, and mascots except for classroom instruction. *See* 8 N.Y.C.R.R. §§ 123.2, 123.5. Finkenbinder does not allege that he is a school employee, so his expression is completely unencumbered by Part 123. Nor does Finkenbinder allege that he has any connection to Massapequa (or any another New York public school district). *See Murthy*, 603 U.S. at 75. Accordingly, Finkenbinder's assertion that Part 123 burdens his "free exercise of cultural expression" (Br. at 48) is unsupported by any factual allegation in the complaint and thus does not provide him standing.

Second, Finkenbinder fails to allege that Part 123 subjects him to any race-based classification. According to Finkenbinder, when public schools stop using Indigenous names, logos, and mascots, his "honor and pride as a tribal member" are diminished. *Id.* at 47. But equal protection

plaintiffs relying on a psychic or emotional injury must allege that they are personally subjected to the discriminatory terms of the law. *See MGM Resorts*, 861 F.3d at 50. Finkenbinder is not personally subjected to Part 123 at all. And his vague assertion that Part 123 "excludes him . . . from having [his] history and ancestry recognized" (A. 19) is too abstract and generalized to constitute an injury in fact. See *supra* at 34-35.

Third, Finkenbinder may not rely on his status as a taxpayer to establish standing. Taxpayer status is generally the type of interest that "is too generalized and attenuated to support Article III standing." *Hein v. Freedom From Religion Found., Inc.*, 551 U.S. 587, 599 (2007); *see Board of Educ. of Mt. Sinai Union Free Sch. Dist. v. New York State Tchrs. Ret. Sys.*, 60 F.3d 106, 110 (2d Cir. 1995) ("State taxpayers, like federal taxpayers, do not have standing to challenge the actions of state government simply because they pay taxes to the state."). Finkenbinder does not attempt to argue, or allege any facts to suggest, that this case falls within any of the narrow exceptions to the bar on taxpayer standing. *See, e.g.*, *Citizens United to Protect Our Neighborhoods*, 98 F.4th at 391-92 (discussing exceptions for Establishment Clause claims alleging misuse of municipal funds). Instead, he rehashes his arguments that Part 123 infringes

upon his First and Fourteenth Amendment rights. *See* Br. at 49-50. But those arguments are meritless for the reasons discussed above.

### C. The District Court Correctly Ruled that Plaintiffs Lack Standing to Bring Certain Claims, and Plaintiffs Waived Any Challenge to Those Rulings.

This Court may affirm the dismissal of all of plaintiffs' claims for lack of standing for the reasons discussed above. In addition, the district court determined that plaintiffs lack standing for multiple independent and claim-specific reasons that plaintiffs do not challenge on appeal. Plaintiffs have thus waived any challenge to those rulings, *see Gross*, 585 F.3d at 95, which compel dismissal of plaintiffs' due process, dormant Commerce Clause, Indian Commerce Clause, and 42 U.S.C. § 1981 claims.

First, the district court correctly held that plaintiffs lack standing to assert a due process claim based on the alleged vagueness and arbitrary enforcement of Part 123. (SPA 68-70.) As the court explained, plaintiffs' due process claim is premised on the harm that Part 123 allegedly "inflicts on Massapequa and the Board to comply with and implement a vague mandate." (SPA 70.) But such harms are allegedly inflicted on only Massapequa and the Board, not on plaintiffs. Because it is not plaintiffs "who are allegedly left uncertain of their rights," plaintiffs failed to

plausibly allege standing to bring a due process claim. *See Center for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 196 (2d Cir. 2002).

Second, the district court properly ruled that plaintiffs failed to plausibly allege any "commercial or economic injury" that could support a dormant Commerce Clause claim. (SPA 74.) "A plaintiff has standing to raise a dormant Commerce Clause claim when it has sustained an injury resulting from a burden on interstate commerce." *MGM Resorts*, 861 F.3d at 45 (quotation marks omitted); *see, e.g.*, *Selevan v. New York Thruway Auth.*, 584 F.3d 82, 89 (2d Cir. 2009) (plaintiff established standing by alleging a "commercial, economic injury that is concrete and specific to them" (quotation marks omitted)). Plaintiffs did not allege any facts to suggest that they suffered any such economic injury here and do not contest this pleading failure on appeal. *See* Br. at 38-39.

Third, the district court correctly determined that plaintiffs lack standing to allege a claim under the Indian Commerce Clause. As the court explained, plaintiffs included only passing references to the Indian Commerce Clause in their complaint, which alone defeated the claim. (*See* SPA 77.) In any event, plaintiffs failed to plausibly allege any injury stemming from the regulation of any activities on tribal lands (SPA 75-77),

as required to demonstrate standing to assert a claim under the Indian Commerce Clause, *cf. Upstate Citizens for Equal., Inc. v. United States*, 841 F.3d 556, 565-66 (2d Cir. 2016) (organization established injury in fact arising from operation of casino on tribal lands).

Fourth, the district court correctly held that the complaint mentions § 1981 only "cursorily in passing" and that plaintiffs failed to assert "any theory of § 1981 injury." (*See* SPA 86-87; *see also* A. 45 (referencing § 1981 in heading only).)

Plaintiffs' failure to challenge these rulings on appeal provides an independent basis to affirm dismissal of the claims discussed in this Point I.C.

# POINT II

## THIS COURT MAY AFFIRM ON THE INDEPENDENT, ALTERNATIVE GROUND THAT THE COMPLAINT FAILS TO STATE A CLAIM

If this Court determines that plaintiffs have standing (they do not), it should affirm on the independent and alternative ground that the complaint fails to state a claim under Federal Rule of Civil Procedure 12(b)(6). *See Beijing Neu Cloud Oriental Sys. Tech. Co. v. International Bus. Machs. Corp.*, 110 F.4th 106, 113 (2d Cir. 2024) (court may affirm on any ground supported by the record).

### A. Plaintiffs Fail to State an Equal Protection Claim or a Title VI Claim.

As explained above (at 25-42), plaintiffs are not injured or subjected to differential treatment based on Part 123. But even if they had been, the complaint still would fail to state a claim under the Equal Protection Clause or Title VI. Plaintiffs assert two related theories of unlawful discrimination, neither of which has merit.

First, plaintiffs claim that § 123.4(b) of Part 123 prevents only Indigenous-affiliated organizations from entering into agreements with public school districts. Br. at 12-13, 25-26, 44-46, 56. This argument misunderstands the regulation. Section 123.4(b) does not "ban[] any school

district from contracting with Indigenous groups or individuals." *Contra id.* at 12. Instead, it confers on tribal nations the ability to consent to a public school's use of an Indigenous name, logo, or mascot that is culturally affiliated with that tribe. 8 N.Y.C.R.R. § 123.4(b). Part 123 does not speak to the ability of school districts to enter into contracts or licensing arrangements concerning names, logos, or mascots separate from this initial consent. And it does not prevent the formation of contracts related to any other topic. *See id.*

Second, and relatedly, plaintiffs claim (Br. at 52) that Part 123's definition of "Indigenous name, logo, or mascot," 8 N.Y.C.R.R. § 123.1, discriminates by applying Part 123 to only Indigenous names and logos. (*See* A. 46-49.) But even assuming arguendo that § 123.1's definition of "Indigenous name, logo, or mascot" imposes a racial classification, Part 123 would satisfy heightened scrutiny because it furthers a compelling state interest and is "narrowly tailored to accomplish the purpose." *See Pyke v. Cuomo*, 567 F.3d 74, 77 (2d Cir. 2009). NYSED has a compelling state interest in ensuring a learning environment for all students that is free from disruption, discrimination, and harassment. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 593-94 (1983). And it also has a compelling

interest in ending the harmful practice of perpetuating racial stereotypes through public schools' use of Indigenous names, logos, and mascots to represent, for example, sports teams. *See Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 207 (2023) (confirming compelling interest in "remediating specific, identified instances of past discrimination that violated the Constitution or a statute").

To that end, New York law prohibits "the creation of a hostile environment . . . that reasonably causes or would reasonably be expected to cause . . . emotional harm to a student." Educ. Law § 11(7). NYSED reasonably concluded that the continued use of Indigenous names, logos, and mascots would violate that law, particularly after a state court upheld the Commissioner's ruling to that effect in the *Cambridge* case. And for more than two decades, NYSED has maintained that the use of Indigenous names, logos, and mascots is detrimental to school communities and students' academic achievement. In reaching this conclusion, NYSED relied on a wealth of academic research and consultation with Indigenous communities and residents across the State. See *supra* at 5-7.

Part 123 is also narrowly tailored to accomplish its purpose. Part 123 does not, as plaintiffs wrongly contend, "categorically ban[] Native Ameri-

can names, symbols, and imagery." *Contra* Br. at 52. To the contrary, Part 123 applies only to public schools and prohibits their use of Indigenous names, logos, or mascots for a specific purpose: to represent the school in school sports or similar activities. 8 N.Y.C.R.R. §§ 123.1-123.2. Part 123 allows the use of such names, logos, or mascots "for purposes of classroom instruction." *Id.* § 123.2. And public schools may continue to use Indigenous, names, logos, and mascots with the approval of an associated tribal nation. *Id.* § 123.4(b). Part 123 imposes no restriction on the public at large, and instead narrowly limits the ability of public school officers and employees to use and promote Indigenous names, logos, or mascots at school functions. *See id.* § 123.5.

For the same reasons, plaintiffs fail to state a claim under Title VI, which "proscribe[s] only those racial classifications that would violate the Equal Protection Clause." *See Alexander v. Sandoval*, 532 U.S. 275, 280-81 (2001) (quotation marks omitted). Plaintiffs' failure to plausibly allege racial discrimination for purposes of their equal protection claim necessarily defeats their Title VI claim. *See Rodrigues v. City of New York*, 835 F. App'x 615, 618 (2d Cir. 2020).

### B. Plaintiffs Fail to State a 42 U.S.C. § 1981 Claim.

Plaintiffs similarly fail to state a claim under § 1981, which "outlaws discrimination with respect to the enjoyment of benefits, privileges, terms, and conditions of a contractual relationship." *See Patterson v. County of Oneida*, 375 F.3d 206, 224 (2d Cir. 2004).

As a preliminary matter, plaintiffs' complaint references § 1981 only in passing and does not even mention the elements of such a claim. (*See* A. 14, 45.) This defect alone warrants dismissal, as the district court correctly concluded. (*See* SPA 86-87.) *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (plaintiff must allege "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do").

In any event, plaintiffs' arguments about § 1981 are meritless. "To establish a claim under 42 U.S.C. § 1981, plaintiffs must allege facts supporting the following elements: (1) plaintiffs are members of a racial minority; (2) defendants' intent to discriminate on the basis of race; and (3) discrimination concerning one of the statute's enumerated activities," e.g., the right "to make and enforce contracts." *Brown v. City of Oneonta*, 221 F.3d 329, 339 (2d Cir. 2000) (quotation marks omitted). Here, plaintiffs

fail to plausibly allege an intent to discriminate on the basis of race, or discrimination concerning the right to contract.

First, "[a]ny claim brought under § 1981 . . . must initially identify an impaired 'contractual relationship' under which the plaintiff has rights." *Domino's Pizza, Inc. v. McDonald*, 546 U.S. 470, 476 (2006) (quoting 42 U.S.C. § 1981(b)). As previously demonstrated (at 26-31), NAGA has no rights under its illusory Agreement with Massapequa. The lack of any contractual relationship that could be impaired disposes of plaintiffs' § 1981 claim.

Although far from clear, plaintiffs appear to argue that they have an impaired contractual relationship based on § 123.4(b), which they contend "bars new agreements involving Indigenous names or imagery after May 3, 2023, and prohibits consideration in preexisting agreements." *See* Br. at 53. According to plaintiffs, "[t]hese provisions prevent the formation of new contracts and impair existing contractual relationships." *Id.* But as explained, these rules govern the manner in which public schools may obtain a tribal nation's consent to use an Indigenous name, logo, or mascot, and do not plausibly implicate the right to contract of third parties like plaintiffs. See *supra* at 33.

Plaintiffs also fail to plausibly allege that § 123.4(b) intentionally discriminates based on race. *See Brown*, 221 F.3d at 339. To the extent plaintiffs argue that only federally or state recognized tribal nations may consent to public schools' use of an Indigenous name, logo, or mascot, that classification is political, not racial. *See Morton v. Mancari*, 417 U.S. 535, 553 n.24 (1974). And plaintiffs do not plausibly allege that Part 123 was motivated by anything other than the desire to eliminate racial discrimination and stereotyping in public schools. *See Spirit Lake Tribe of Indians ex rel. Comm. of Understanding & Respect v. NCAA*, 715 F.3d 1089, 1092-93 (8th Cir. 2013) (plaintiffs failed to plausibly allege § 1981 claim against NCAA based on policy designed to "eliminate the use of 'hostile and abusive' mascots and imagery").

## C. Plaintiffs Fail to State a First Amendment Claim.

Plaintiffs fail to state a claim under the First Amendment, whether as direct abridgment of their freedom of speech or under the overbreadth doctrine.

"The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws 'abridging the freedom of speech.'" *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). According to plaintiffs, Part 123 "singles out indigenous cultural expression for prohibition." Br. at 51. But Part 123, which regulates only public schools and their employees, does not abridge the speech of NAGA or any of its members.

Plaintiffs also fail to state a claim under the overbreadth doctrine. *Contra id.* at 51-52. A party alleging an overbreadth claim argues that, "although a statute did not violate his or her First Amendment rights, it would violate the First Amendment rights of hypothetical third parties if applied to them."[18] *Farrell v. Burke*, 449 F.3d 470, 498 (2d Cir. 2006). "All

---

[18] A plaintiff asserting an overbreadth claim under the First Amendment still must demonstrate standing to sue. *Brokamp v. James*, 66 F.4th 374, 389-90 (2d Cir. 2023). Plaintiffs here do not. See *supra* at 25-42.

overbreadth challenges are facial challenges, because an overbreadth challenge by its nature assumes that the measure is constitutional as applied to the party before the Court." *Id.* "Because invalidating *all* enforcement of a challenged law is strong medicine, the challenging party must demonstrate from the text of the law and from actual fact that a substantial number of instances exist in which the law cannot be applied constitutionally." *United States v. Thompson*, 896 F.3d 155, 163 (2d Cir. 2018) (alteration, quotation marks, and citations omitted). And "the statute must be overbroad not only in an absolute sense, but also relative to the statute's plainly legitimate sweep." *Id.* (quotation marks omitted).

Here, Part 123's prohibition on only *public schools'* use of Indigenous names, logos, and mascots (§§ 123.1-123.4) does not implicate any protected speech and thus any overbreadth challenge to those provisions necessarily fails. *See Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 495-97 (1982). As explained, public schools' own use of their names, logos, and mascots is not entitled to First Amendment protection. See *supra* at 34. And plaintiffs have "no First Amendment right to speak for the government." *Downs v. Los Angeles Unified Sch. Dist.*, 228 F.3d 1003, 1017 (9th Cir. 2000).

Absent any connection to protected speech, plaintiffs' generalized objections to Part 123 (e.g., that Part 123 purportedly prohibits too many names, logos, and mascots) amount to mere policy disagreements. *See* Br. at 51-52. In any event, plaintiffs have not attempted to show that the prohibited names, logos, and mascots they view as "innocuous" (*id.* at 51) constitute a substantial portion of the names, logos, and mascots to which Part 123 applies. *See Washington State Grange v. Washington State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (overbreadth doctrine does not apply "where the parties fail to describe the instances of arguable overbreadth of the contested law").

The only provision of Part 123 that even arguably implicates protected speech is § 123.5, which regulates only school officers and employees "when located on school property or at a school function." 8 N.Y.C.R.R. § 123.5. But plaintiffs allege no facts tending to show that this provision implicates a substantial amount of protected speech in relation to its plainly legitimate sweep. The First Amendment does not prohibit public employers from restricting public employees speaking pursuant to their official duties. *Garcetti v. Ceballos*, 547 U.S. 410, 421-22 (2006). Because school officers and employees necessarily are on duty during much, if not

most, of the time that they are "located on school property or at a school function," § 123.5 has a broad legitimate sweep and plaintiffs allege no facts to the contrary.

### D. Plaintiffs Fail to State a Due Process Claim.

Plaintiffs fail to plausibly allege any due process claim. Plaintiffs' due process claim is primarily based on their contention that Part 123 is void for vagueness.[19] (*See* A. 53-55, 214-215.) A statute is void for vagueness if (i) "'it fails to provide people of ordinary intelligence a reasonable opportunity to understand what conduct it prohibits'" or (ii) "'it authorizes or even encourages arbitrary and discriminatory enforcement.'" *Slattery v. Hochul*, 61 F.4th 278, 294 (2d Cir. 2023) (quoting *Hill v. Colorado*, 530 U.S. 730, 732 (2000)).

---

[19] To the extent plaintiffs attempt to assert a substantive due process claim based on the alleged violation of public school districts' rights (*see* A. 55, 214-215), that claim fails for lack of standing and because municipal corporations, such as public school districts, have "no privileges or immunities under the federal constitution" vis-à-vis the State. *See Ysursa*, 555 U.S. at 363 (quotation marks omitted); *see also City of New York v. Richardson*, 473 F.2d 923, 929 (2d Cir. 1973); *Aguayo v. Richardson*, 473 F.2d 1090, 1100-01 (2d Cir. 1973).

This Court has recognized that "regulations need not achieve 'meticulous specificity' and may instead embody 'flexibility and reasonable breadth.'" *Rock of Ages Corp. v. Secretary of Labor*, 170 F.3d 148, 156 (2d Cir. 1999) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 110 (1972)). In this assessment, courts also consider whether the regulated party "may have the ability to clarify the meaning of the regulation by its own inquiry." *Hoffman Estates*, 455 U.S. at 498.

In addition to the fact that plaintiffs are not regulated by Part 123, plaintiffs fail to state a claim for the additional reason that they concede that Part 123 clearly applies to Massapequa's name and logo. *See* Br. at 11-13, 40. (*See* A. 17-18.) The Agreement expressly recognizes that Massapequa is subject to Part 123 and that the regulation requires Massapequa to discontinue using "a Native American chief as the District's symbol and to discontinue utilizing the name 'Chiefs.'" (A. 63.) Plaintiffs thus do not plausibly allege that they lacked fair notice that Part 123 would apply to Massapequa's use of the Chiefs name and logo. And because Part 123 is not void for vagueness as applied to the current case, it follows that plaintiffs cannot prevail on a facial challenge, either. *See Vermont Right to Life Comm., Inc. v. Sorrell*, 758 F.3d 118, 128 (2d Cir. 2018).

Even putting plaintiffs' concessions aside, Part 123's definition of "Indigenous name, logo, or mascot" clearly explains the circumstances under which it applies. *See Brokamp v. James*, 66 F.4th 374, 404 (2d Cir. 2023). The regulation prohibits public schools from using a defined category of names, logos, and mascots for school sports teams and similar entities; provides a clear timeline for compliance; and specifies the limited circumstances in which public school officers and employees are prohibited from using such names, logos, and mascots. *See* 8 N.Y.C.R.R. §§ 123.1-123.5. NYSED also provided detailed guidance explaining the precise circumstances in which the regulation applies and offering to answer questions concerning Part 123 and its implementation.[20] The text of the regulation and the accompanying agency guidance squarely refute plaintiffs' allegations that Part 123 "leaves enforcement entirely to subjective interpretation" and delegates "broad interpretive and enforcement authority to local school boards without providing clear, objective, or uniform standards" (A. 54-55). *See Hoffman Estates*, 455 U.S. at 498; *Advance Pharm., Inc. v. United States*, 391 F.3d 377, 397 (2d Cir. 2004) (vagueness challenge failed

---

[20] *See* Part 123 FAQ, *supra*.

where plaintiff received confirmation of statutory interpretation from government).

### E. Plaintiffs Fail to State a Dormant Commerce Clause Claim.

"[T]he Commerce Clause prohibits the enforcement of state laws driven by . . . economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." *National Pork Producers Council v. Ross*, 598 U.S. 356, 369 (2023) (quotation marks omitted). To state a claim under the dormant Commerce Clause, the plaintiff must (among other requirements) "identify an in-state commercial interest that is favored, directly or indirectly, by the challenged statutes at the expense of out-of-state competitors." *Selevan*, 584 F.3d at 95 (alteration and quotation marks omitted).

Here, plaintiffs do not plausibly allege a competitive market for Indigenous names, logos, or mascots used to represent public schools, nor do they identify any relevant in-state or out-of-state commercial interests affected by Part 123. According to plaintiffs, Part 123 favors the interests of in-state tribal nations over out-of-state tribal nations because § 123.4(b)'s tribal-approval provision extends only to tribal nations within New York State. (A. 57-58.) But tribal nations that provide approval under Part 123

do not receive "any money, consideration, or thing of value." 8 N.Y.C.R.R. § 123.4(b). It follows that Part 123 does not favor any "in-state *commercial* interest." *See Selevan*, 584 F.3d at 95 (emphasis added).

Nor do plaintiffs identify any out-of-state commercial interests at issue. Here, for example, Massapequa's name and logo are in the public domain and reference a historical, local tribal leader. (*See* SPA 18; A. 30-33.) Plaintiffs' assertion that there is a nationwide market for licensing Indigenous names, logos, and mascots (A. 216) is therefore irrelevant (and appears nowhere in the complaint (*see* A. 56-58)). Because plaintiffs fail to allege that Part 123 implicates a competitive market, they cannot state a claim under the dormant Commerce Clause. *See General Motors Corp. v. Tracy*, 519 U.S. 278, 300 (1997).

### F. Plaintiffs Fail to State an Indian Commerce Clause Claim.

Plaintiffs also fail to plausibly allege any claim under the Indian Commerce Clause. Under that clause, "Congress shall have Power . . . [t]o regulate Commerce . . . with the Indian Tribes." U.S. Const. art. I, § 8, cl. 3. In assessing claims under the Indian Commerce Clause, this Court considers "the location of the targeted conduct and the citizenship of the participants in that activity." *Otoe-Missouria Tribe of Indians v. New*

*York State Dep't of Fin. Servs.*, 769 F.3d 105, 113 (2d Cir. 2014). Generally, "the Indian Commerce Clause's grant of authority to the federal government, and preemption of state authority, extends only to activities occurring in 'Indian country,' i.e., Indian lands within the territory of the United States." *Grand River Enters. Six Nations, Ltd. v. Pryor*, 425 F.3d 158, 173 (2d Cir. 2005).

Aside from describing the Indian Commerce Clause (A. 56), the complaint does not allege any facts to support a claim under that clause. The district court properly rejected the claim on that basis alone. (SPA 76-77.) The claim also fails for the independent reason that plaintiffs do not plausibly allege that Part 123 implicates activities on tribal lands or involving tribal members. Part 123 regulates public schools and expressly excludes tribal nations from its scope. *See* 8 N.Y.C.R.R. §§ 123.2, 123.4(a). The tribal-approval provision does not regulate Indian commerce or affairs but rather confers on tribal nations the ability to consent to the use of Indigenous names, logos, or mascots *by public schools* located outside of tribal lands. *See id.* § 123.4(b). The provision's restriction on offering or accepting money or other consideration for a tribal nation's authorization operates only on public schools. *See id.* § 123.4(b). And a tribe otherwise

has "no legitimate interest in selling an opportunity to evade state law." *Otoe-Missouria Tribe of Indians*, 769 F.3d at 114.

## POINT III

### THE DISTRICT COURT CORRECTLY DENIED A PRELIMINARY INJUNCTION

Having dismissed plaintiffs' complaint for lack of standing, the district court correctly denied as academic plaintiffs' motion for a preliminary injunction against enforcement of Part 123. *See Rojas v. Cigna Health & Life Ins. Co.*, 793 F.3d 253, 259 (2d Cir. 2015). If the Court disagrees with that dismissal, it should nonetheless affirm the denial of a preliminary injunction or, at minimum, remand to the district court to consider the preliminary injunction factors in the first instance.

"A preliminary injunction is 'an extraordinary remedy' that courts may only award 'upon a clear showing that the plaintiff is entitled to such relief.'" *National Ass'n for Gun Rights v. Lamont*, 153 F.4th 213, 228 (2d Cir. 2025) (quoting *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008)). To obtain a preliminary injunction, plaintiffs must show that "(1) they are likely to succeed on the merits of their claims, (2) they are likely to suffer irreparable harm in the absence of preliminary relief, (3)

the balance of equities tips in their favor, and (4) issuing an injunction is in the public interest."[21] *Id.* None of these factors are satisfied here.

First, plaintiffs have failed to identify any legally cognizable injury—much less irreparable harm—that Part 123 would impose on them absent a preliminary injunction. The alleged impairment of NAGA's Agreement with Massapequa cannot support irreparable harm because the Agreement is illusory. See *supra* at 26-31. Otherwise, plaintiffs primarily rely on the alleged violation of their constitutional rights (Br. at 58-59), which requires "a strong showing of a constitutional deprivation" to establish irreparable harm, *see A.H. ex rel. Hester v. French*, 985 F.3d 165, 176 (2d Cir. 2021). Plaintiffs made no such showing. Instead, the declarations plaintiffs submitted in support of their preliminary injunction motion confirm that Part 123 does not affect NAGA or any of its members and that plaintiffs merely disagree with the policy. (*See* A. 234-243.)

---

[21] Because plaintiffs seek a mandatory injunction to alter the status quo by upending New York's existing regulatory framework, they must "meet a heightened legal standard by showing a clear or substantial likelihood of success on the merits." *See North Am. Soccer League, LLC v. United States Soccer Fed'n, Inc.*, 883 F.3d 32, 37 (2d Cir. 2018) (quotation marks omitted).

Second, plaintiffs are exceedingly unlikely to succeed on the merits of their claims. As explained, plaintiffs both lack standing and fail to state any claim on the merits. See *supra* at 25-61.

Third, the equities and public interest factors—which merge when, as here, the government is party to the suit, *National Ass'n for Gun Rights*, 153 F.4th at 249—weigh in favor of defendants. Plaintiffs suffer no hardship from the denial of a preliminary injunction because Part 123 does not affect their legal interests. By contrast, granting a preliminary injunction would irreparably harm defendants by preventing NYSED from effectuating Part 123. *See Abbott v. Perez*, 585 U.S. 579, 602 n.17 (2018). And it would further undermine the State's interest—and the interest of public school students—in an education free from discrimination and harassment. As the record reflects, public schools' use of Indigenous names, logos, and mascots causes psychological harm to students by perpetuating racial stereotypes and prejudices (D.A. 30-31, 103) and violates state law, such as the Dignity for All Students Act, which requires protection against the same (see *supra* at 6).

On that basis, the two recognized tribal nations on Long Island expressly support Part 123. A representative of the Shinnecock Indian

Nation explained that "the use of Indigenous names, logos, or mascots for school sports teams—like the Massapequa 'Chiefs' and the supposed image of Sachem Tackapausha—is oppressive and hurtful to children." (D.A. 108.) The Unkechaug Nation has disavowed Massapequa's logo as a "grotesque and exaggerated image of a living people" that harms "both native and non-native students alike." (D.A. 118.) Plaintiffs' contrary view does not outweigh these considerations.

## CONCLUSION

The judgment of the district court should be affirmed.

Dated: New York, New York
April 8, 2026

Respectfully submitted,

LETITIA JAMES
*Attorney General*
*State of New York*
Attorney for Appellees

By: */s/ Stephen J. Yanni*
STEPHEN J. YANNI
Assistant Solicitor General

28 Liberty Street
New York, New York 10005
(212) 416-6184

BARBARA D. UNDERWOOD
*Solicitor General*
JUDITH N. VALE
*Deputy Solicitor General*
STEPHEN J. YANNI
*Assistant Solicitor General*
*of Counsel*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a) of the Federal Rules of Appellate Procedure, Mary Quinn Moss, an employee in the Office of the New York State Attorney General, hereby certifies that according to the word count feature of the word processing program used to prepare this brief, the brief contains 12,372 words and complies with the typeface requirements and length limits of Rule 32(a)(5)-(7) and Local Rule 32.1.

*/s/ Mary Quinn Moss*